UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JOYCE M. SWAYZE,

               Plaintiff,

     v.                          **DECISION AND ORDER**
                                     **05-CV-0446**

JOANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

## Introduction

1.      Plaintiff Joyce M. Swayze challenges an Administrative Law Judge's ("ALJ") determination that she is not entitled to disability insurance benefits ("DIB") under the Social Security Act ("the Act").  Plaintiff alleges she has been disabled since September 1, 1999, because of pain and limitations from carpal tunnel syndrome in her left and right wrists, right elbow pain, left ankle pain, heartbeat irregularity, hemochromotosis, and chronic otitis media. Plaintiff met the disability insured status requirements of the Act at all times pertinent to this claim.

## Procedural History

2.      Plaintiff filed an application for DIB on September 22, 2003.  Her application was denied initially and, under the prototype model of handling claims without requiring a reconsideration step, Plaintiff was permitted to appeal directly to the ALJ.  See 65 Fed. Reg. 81553 (Dec. 26, 2000). Pursuant to Plaintiff's request, an administrative hearing was held on September 9, 2004, before ALJ Alfred R. Tyminski, at which time Plaintiff, her

husband, and her attorney appeared.  The ALJ considered the case *de novo*, and on December 23, 2004, issued a decision finding that Plaintiff was not disabled.  On March 24, 2005, the Appeals Council denied Plaintiff's request for review.

3.      On April 12, 2005, Plaintiff filed a Civil Complaint challenging Defendant's final decision and requesting the Court review the decision of the ALJ pursuant to Section 205(g) and 1631(c) (3) of the Act, modify the decision of Defendant, and grant DIB benefits to Plaintiff.[1]  The Defendant filed an answer to Plaintiff's complaint on July 19, 2005, requesting the Court to dismiss Plaintiff's complaint.  Plaintiff submitted a Memorandum of Points and Authorities In Support of Plaintiff's Request for Review of Administrative Law Judge's Unfavorable Determination of Employment Disability (hereinafter called "Plaintiff's Brief") on August 1, 2005.  On September 13, 2005, Defendant filed a Defendant's Brief in Opposition to Plaintiff's Motion and In Support of the Commissioner's Motion for Judgment on the Pleadings[2] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  After full briefing, the Court deemed oral argument unnecessary and took the motions under advisement.

## Discussion

### Legal Standard and Scope of Review:

---

[1] The ALJ's December 23, 2004, decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.
[2] Although no motion for judgment on the pleadings was filed, the moving party was excused from such filing under General Order No. 18, which states in part: "The Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings…"

4.      A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  <u>See</u> 42 U.S.C. § 405(g), 1383 (c)(3); <u>Wagner v. Sec'y of Health and Human Servs.</u>, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if it is not supported by substantial evidence or there has been a legal error.  <u>See</u>  <u>Grey v. Heckler</u>, 721 F.2d 41, 46 (2d Cir. 1983); <u>Marcus v. Califano</u>, 615 F.2d 23, 27 (2d Cir. 1979).  "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  <u>See</u> <u>Rutherford v. Schweiker</u>, 685 F.2d 60, 62 (2d Cir. 1982).

5.      "To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  <u>Williams on Behalf of Williams v. Bowen</u>, 859 F.2d 255, 258 (2d Cir. 1988).  If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]."  <u>Rosado v. Sullivan</u>, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).  In other words, this Court must afford the Commissioner's

determination considerable deference, and may not substitute "its own

judgment for that of the [Commissioner], even if it might justifiably have

reached a different result upon a *de novo* review."  Valente v. Sec'y of Health

and Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

6.     The Commissioner has established a five-step sequential

evaluation process to determine whether an individual is disabled as defined

under the Social Security Act.  See 20 C.F.R. § 404.1520, 416.920.  The

United States Supreme Court recognized the validity of this analysis in Bowen

v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119

(1987), and it remains the proper approach for analyzing whether a claimant

is disabled.

7.     This five-step process is detailed below:

First, the [Commissioner] considers whether the claimant is currently
engaged substantial gainful activity.  If he is not, the [Commissioner]
next considers whether the claimant has a "severe impairment" which
significantly limits his physical or mental ability to do basic work active-
ties.  If the claimant has such an impairment, the third inquiry is whether,
based solely on medical evidence, the claimant has an impairment
which is listed in Appendix 1 of the regulations.  If the claimant has
such an impairment, the [Commissioner] will consider him disabled with-
out considering vocational factors such as age, education, and work
experience; the [Commissioner] presumes that a claimant who is
afflicted with a "listed" impairment is unable to perform substantial gain-
ful activity.  Assuming the claimant does not have a listed impairment,
the fourth inquiry is whether, despite the claimant's severe impairment,
he has the residual functional capacity to perform his past work.  Finally,
if the claimant is unable to perform his past work, the [Commissioner]
then determines whether there is other work which the claimant could
perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam); see also

Rosa v. Callahan, 168 F.3d 72,77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

8.      While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step.  <u>See</u> <u>Bowen</u>, 482 U.S. at 146 n.5; <u>Ferraris v. Heckler</u>, 728 F.2d 582 (2d Cir. 1984). The final step of this inquiry is, in turn, divided into two parts.  First, the Commissioner must assess the claimant's job qualifications by considering his physical ability, age, education, and work experience.  Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform.  <u>See</u> 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

9.      In this case, the ALJ made the following findings with regard to factual information as well as the five-step process set forth above: (1) Plaintiff meets the nondisability requirements for a period of disability And Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of the decision (R. at 19);[3]  (2) Plaintiff has not engaged in substantial gainful activity since her retirement on September 1, 1999 (R. at 19); (3) Plaintiff's history of tacychardia, history of left ankle ligament repair, and history of carpal tunnel release are considered "severe" based on the requirements in the Regulations 20 C.F.R. § 404.1520(c) (R. at 20); (4) Plaintiff's medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4 (R. at 20); (5) Plaintiff's allegations regarding her limitations are not entirely credible (R. at 20); (6) Plaintiff has the residual

---

[3] Citations to the underlying administrative are designated as "R."

functional capacity for a full range of at least sedentary work activity.  Plaintiff is capable of lifting and/or carrying 10 pounds occasionally, five pounds frequently, standing and/or walking at least two hours in an eight-hour workday, sitting about six hours in an eight-hour workday, with unlimited pushing/pulling as shown for lifting and carrying (R. at 20);  (7) Plaintiff's past relevant work as a medical fee clerk in an insurance field did not require the performance of work-related activities precluded by her residual functional capacity (20 C.F.R. § 404.1565) (R. at 20);  (8) Plaintiff was not prevented from performing her past relevant work, since the asserted onset date, by any impairment(s) lasting 12 continuous months (R. at 20); and (9) Plaintiff was not under a "disability," as defined in the Social Security Act, at any time through the date of the ALJ's decision (20 C.F.R. 404.1520(f)) (R. at 20). Ultimately, the ALJ determined Plaintiff was not entitled to a period of disability and disability insurance benefits as set forth in sections 216(i) and 223(d) of the Social Security Act (R. at 20).

**Plaintiff's Allegations:**

**The ALJ Failed to Give Adequate Consideration to the Disability Determination Provided by Plaintiff's Treating Physicians:**

10.     Plaintiff's first challenge to the ALJ's decision is that he did not give adequate consideration to the medical evidence, and the disability determination, provided by Plaintiff's treating physicians, Doctors Short and Polkowski, and instead substituted his own lay opinion for competent medical

evidence[4].  See Plaintiff's Brief, pp. 6-8.  Thus, Plaintiff asserts the ALJ's

determination that she retained the residual functional capacity to perform a

full range of sedentary work is not based on the substantial evidence of

record.  See Plaintiff's Brief, pp. 8-10.

      According to the "treating physician's rule,"[5] the ALJ must give

controlling weight to the treating physician's opinion when the opinion is well-

supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in [the]

record."  20 C.F.R. § 404.1527(d)(2); see also Green-Younger v. Barnhart,

No. 02-6133, 2003 WL 21545097, at *6 (2d Cir. July 10, 2003); Shaw v.

Chater, 221 F.3d 126, 134 (2d Cir. 2000).

      Even if a treating physician's opinion is deemed not to be deserving

of controlling weight, an ALJ may nonetheless give it "extra weight" under

certain circumstances.  Under  C.F.R. § 404.1527(d)(1)-(6), the ALJ should

consider the following factors when determining the proper weight to afford

the treating physician's opinion if it is not entitled to controlling weight: (1)

length of the treatment relationship and the frequency of examination, (2)

nature and extent of the treatment relationship, (3) supportability of opinion,

(4) consistency, (5) specialization of the treating physician, and (6) other

factors that are brought to the attention of the court.  See de Roman, 2003

---

[4] Plaintiff's treating cardiologist, Dr. Joseph Battaglia, also provided an assessment of Plaintiff's ability to work, and this assessment will be discussed in this decision (R. at 473).
[5] "The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. SS 404.1527 detailing the weight to be accorded a treating physician's opinion." de Roman v. Barnhart, No.03-Civ.0075(RCC)(AJP), 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).

WL 21511160, at *9 (citing C.F.R. § 404.1527(d)(2); see also Shaw, 221 F.3d at 134; Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

Having reviewed the evidence at issue, this Court detects no reversible error in the ALJ's treatment of the opinion of Plaintiff's treating physicians, Doctors Short and Polkowski, as well as the opinion of treating physician Dr. Battaglia.  Rather, the ALJ's decision reflects his extensive evaluation of all the medical evidence in the record developed from the date of Plaintiff's alleged disability on September 1, 1999, through the date of the ALJ's decision on December 23, 2004 (R. at 13-20).  The medical evidence includes treatment notes, evaluations of Plaintiff's progress, and test results (R. at 96-485). The opinions of Doctors Short, Polkowski, and Battaglia were inconsistent and unsupported by the record as a whole.

Plaintiff's medical record documents that she suffers from ailments that the ALJ determined to be severe, but not disabling, either alone or in combination (R. at 14-20).  From March 1974, until August 2003, Plaintiff was treated for chronic otitis media in her left and right ears (R. at 96-141).  On August 7, 2003, her treating physician, Dr. F. Sean Hodge, noted Plaintiff's chronic otitis media appeared stable (R. at 122).

Plaintiff was examined by treating physician, Dr. Walter Short, on May 6, 1993, when she complained of pain, numbness, and paresthesias in both hands (R. at 248).  Dr. Short noted Plaintiff had undergone nerve conduction studies in January 1993, that revealed minimal carpal tunnel syndrome in the right wrist and normal results in the left wrist.  Id. Upon

physical examination, Plaintiff had full range of motion in both wrists.  Id.  She had a positive Phalen's sign and a negative Tinel's sign bilaterally[6].  Dr. Short noted Plaintiff had normal motor function bilaterally.  Id.  In spite of the limited results obtained form Plaintiff's nerve conduction studies, the doctor diagnosed Plaintiff with carpal tunnel syndrome bilaterally, and offered her several treatment options.  Id.  Plaintiff elected endoscopic carpal tunnel release over more conservative forms of treatment.  Id.

Plaintiff underwent endoscopic carpal tunnel release on her right and left wrists on September 7, 1993, and October 19, 1993, respectively (R. at 250-252).  At a follow up visit with Dr. Short on November 23, 1993, Plaintiff claimed she was free from the pain and symptoms of carpal tunnel syndrome, and the doctor released her to return to her employment as a medical records clerk the following week (R. at 253).

On May 3, 1994, Plaintiff was treated by Dr. Short after she tripped and fell at work, injuring her right elbow (R. at 254, 265).  Upon physical examination, the doctor noted Plaintiff had full range of motion of the elbow, with no effusion in the area of the injury.  Id.  She had a negative Tinel's sign at the ulnar nerve, and radiology studies of the elbow revealed normal results.

_____

[6] The test for **Tinel's Sign** test is performed by tapping the median nerve along its course in the wrist. A positive test is found when this causes worsening of the tingling in the fingers when the nerve is tapped.   The test for **Phalen's Sign** is performed by pushing the backs of the hands together for one minute to compress the carpal tunnel.  A positive test is found when this maneuver causes the typical symptoms of carpal tunnel syndrome.  See http://orthopedics.about.com/cs/carpaltunnel/a/carpaltunnel_2.htm.

Id.  Dr. Short's impression was that Plaintiff had a resolving contusion of the right elbow.  Id.

Dr. Short examined Plaintiff again on March 1, 1995, when she complained of continuing pain in her right elbow, and numbness and paresthesias in the ulnar two digits of her right hand (R. at 255).  Upon physical examination, Plaintiff had full range of motion of the right elbow, with positive Tinel's sign over the ulnar nerve.  Id.  The doctor noted Plaintiff had mild medial epicondylar pain.  Id.  Dr. Short recommended Plaintiff undergo nerve conduction studies to determine if she had ulnar nerve compression at the right elbow.  Id.  The doctor also performed Plaintiff's final evaluation following her bilateral endoscopic carpal tunnel release surgeries.  Id.  Dr. Short observed Plaintiff's incisions had healed and she had full range of motion of the digits of both hands.  Id.  Plaintiff had dorsiflexion and volar flexion of 55 degrees at the wrists.  Id.  The doctor noted Plaintiff complained of intermittent symptoms in both hands, especially after typing, and suggested Plaintiff should not type more than four hours per day.   Id.  Dr. Short opined Plaintiff had a permanent partial impairment to both hands.  Id.

On March 27, 1995, Plaintiff was admitted to Crouse Irving Memorial Hospital with complaints of right flank pain, accompanied by a fever and nausea (R. at 397-398).  Other than fever, Plaintiff's physical examination was normal (R. at 397).  Blood, urine, and other laboratory tests were normal. Id.  A renal scan and an ultrasound of Plaintiff's gallbladder were

unremarkable (R. at 397-398).  Plaintiff was diagnosed with pyelonephritis[7]

and given antibiotic therapy (R. at 398).  She was discharged from the

hospital with prescriptions for oral antibiotics and pain medication on March

31, 1995.  Id.

On April 12, 1995, April 21, 1995, May 3, 1995, Plaintiff followed up

with consulting physician, Dr. Joel Bass, after her hospitalization (R. at 399,

401, 406-407).  Dr. Bass noted Plaintiff's physical examinations were

unremarkable, and stated he was unsure about the etiology of Plaintiff's

complaints about pain under her lower right rib in the area if her kidney (R. at

401).  Additional renal scans on May 9, 1995, and on May 16, 1995, were

normal, with no evidence of obstructive uropathy (R. at 395, 396).

On July 12, 1995, Plaintiff was examined by Dr. Short after

undergoing a nerve conduction study of her right elbow (R. at 255).  The

study showed no evidence of compression of the median nerve, and a slight

decrease in the sensory action potential for the ulnar nerve.  Id.  The doctor

advised Plaintiff not to lean on her right elbow, or rest the medial side of her

arm against objects.  Id.

Plaintiff was examined by Dr. Short on October 4, 1995, when she

complained of paresthesias in her right ulnar nerve (R. at 256).  The doctor

opined Plaintiff had right ulnar nerve entrapment and limited her to using a

computer for no longer than five hours each day.  Id.  Dr. Short advised

---

[7] Pyelonephritis is an infection of the kidney and the ducts that carry urine away from the kidney
(ureters).  See http://nlm.nih.gov/medlineplus/ency/article/000522.htm.

Plaintiff that if she needed to use a computer for longer than five hours in a workday, she should take frequent breaks.  Id.

On November 11, 1995, Plaintiff was examined by treating physician, Dr. Patrick Scerpella, when she complained of left ankle instability resulting from a sprain in March 1994 (R. at 143-144).  During physical examination of the ankle, the doctor noted some tenderness and weakness, along with a positive Tinel's sign at the level of the ankle joint with radiation distally into the medial dorsal forefoot (R. at 143).  An x-ray of Plaintiff's ankle was normal, and revealed no degenerative changes (R. at 144).  However, an MRI showed mild degenerative changes in the bony tarsus, but was otherwise unremarkable (R. at 161).  Dr. Scerpella diagnosed left ankle instability and recommended Plaintiff wear an ankle brace and engage in physical therapy.  Id.

Plaintiff followed up with Dr. Scerpella on December 28, 1995, and reported that she did not think physical therapy exercises on her left ankle were helping to improve the stability of the ankle (R. at 145).  The doctor recommended Plaintiff continue physical therapy exercises as instructed.  Id.

Dr. Scerpella examined Plaintiff again on February 14, 1996, when she reported increased strength in her left ankle (R. at 146).  The doctor opined Plaintiff was doing better, and recommended she continue with her physical therapy exercises.  Id.

On March 4, 1996, Plaintiff underwent surgical decompression of the ulnar nerve in her right elbow (R. at 257-258).  Dr. Short performed the

12

surgery and followed Plaintiff's recovery during the months of April, May, June, August, and September 1996 (R. at 259-262).  The doctor performed a post-operative examination of Plaintiff's right elbow on October 9, 1996, before releasing her to return to her regular employment the following week (R. at 262).  At the time of the examination, Plaintiff had a range of motion in her right elbow between zero and 135 degrees, with no further symptoms of nerve compression.  Id.

While Plaintiff was recovering from her elbow surgery, she continued to complain of left ankle instability to Dr. Scerpella (R. at 148).  On July 25, 1996, the doctor examined Plaintiff's ankle and noted some tenderness and swelling.  Id.  He recommended Plaintiff have an MRI study of the ankle and continue with physical therapy.  Id.

Dr. Scarpella reviewed with Plaintiff the results of her MRI on September 5, 1996 (R. at 149, 162).  He noted the MRI was normal except for some scar tissue, and opined Plaintiff might have an inter-articular scar that could be the cause of her symptoms (R. at 149).  The doctor recommended surgery to remove the scar.  Id.

Plaintiff underwent ligamentous reconstruction and removal of scar tissue from her left ankle in early May 1996 (R. at 156).  The surgery was unremarkable and Dr. Scarpella released Plaintiff to return to work on June 9, 1997 (R. at 157).  At her six months' post-operative visit on October 14, 1997, the doctor noted Plaintiff claimed only on episode of ankle instability (R. at 159).  Physical examination of Plaintiff's left ankle was unremarkable, and she

reported no pain.  Id.  Dr. Scerpella opined Plaintiff was doing well and recommended she return for an examination one year after the date of her surgery.  Id.

On January 29, 1998, Plaintiff was examined by Dr. Short when she complained of numbness in her right hand and arm, and discomfort in her right elbow (R. at 263).  While Plaintiff had full range of motion in the elbow and wrist, she reported diffuse discomfort around the elbow, with a positive Tinel's sign.  Id.  Dr. Short recommended Plaintiff start physical therapy again. Id.

Dr. Scarpella examined Plaintiff on February 4, 1998, nine months after her left ankle surgery (R. at 160).  The doctor noted Plaintiff walked 20 minutes per day, and reported no pain.  Id.  Physical examination revealed good ankle strength, and the doctor opined the Plaintiff was doing well.  Id.

Plaintiff was examined again by Dr. Short on March 25, 1998, when she complained of pain and numbness in her right forearm, and difficulty lifting with the right arm (R. at 264).  The doctor opined Plaintiff had a ten percent scheduled loss of use of her right wrist and 20 percent scheduled loss of use of her right elbow.  Id.

On July 9, 1999, Plaintiff was admitted to Crouse Irving Memorial Hospital complaining of flank and inguinal pain, with fever, chills, and nausea (R. at 164-165).  Tests and x-rays completed during Plaintiff's hospitalization were essentially normal, and she was released to outpatient care (R. at 165).

Plaintiff was evaluated by consulting physician, Dr. Deborah Markham, on May 19, 2000, for liver disease including hemochromotosis (R. at 166-167).  The doctor delayed a diagnosis pending records from Plaintiff's other treating and consulting physicians (R. at 167).  Plaintiff was again examined by Dr. Markham on February 8, 2001, after complaining of epigastric discomfort (R. at 168).  The doctor noted Plaintiff's iron studies were normal, and recommended a CT scan of Plaintiff's abdomen.  Id.

On February 19, 2001, a nurse practitioner reviewed with Plaintiff her CT scan and physical examination, and noted the results were unremarkable (R. at 417).

On May 21, 2001, Plaintiff complained to consulting physician, Dr. Mark Berg, of pain in her right distal foot (R. at 427).  The doctor's impression was that Plaintiff had a neuroma, and prescribed Vioxx.  Id.

Plaintiff followed up on her foot problem with treating physician, Dr. Kurt Concilla, on July 12, 2001 (R. at 423).  Dr Concilla opined Plaintiff had a neuroma in the inter-metatarsal space of the right foot and recommended pain injections and intersoles for Plaintiff's shoes.  Id.  When Plaintiff was again examined by Dr. Concilla on August 2, 2001, he noted Plaintiff's neuroma was responding to treatment and prescribed additional pain injections (R. at 425).

On March 30, 2002, Plaintiff was transported by ambulance to Crouse Irving Memorial Hospital after complaining of heart palpitations (R. at 172-173).  The emergency medical technicians documented Plaintiff suffered

from supraventricular tachycardia (SVT) during the ambulance ride (R. at 172)[8].  Upon admission to the hospital, Plaintiff was examined by emergency room physician, Dr. John Skopek, who noted Plaintiff's blood pressure, pulse and respirations were normal.  Id.  Her heartbeat was regular in rhythm without gallop, rub, or murmur.  Id.  Cardiac enzymes were normal.  Id.  Examination of Plaintiff's abdomen also revealed normal results.  Id.  The only remarkable findings noted during Plaintiff's hospital stay were that her serum potassium and serum bicarb were low.  Id.  Plaintiff was discharged from the hospital on March 31, 2002, with a recommendation that she follow up with a cardiologist (R. at 172-173).

Plaintiff was examined by her treating physician, Dr. Cheryl Polkowski, on April 2, 2002 (R. at 434).  She complained of achiness and tightness in her chest present since the SVT episode, but no shortness of breath or further palpitations.  Id.  Plaintiff's physical examination was unremarkable.  Id.  Dr. Polkowski recommended Plaintiff discontinue her long walks until she could be evaluated by a cardiologist.  Id.

On April 9, 2002, Plaintiff underwent a stress echocardiogram using Bruce protocol (R. at 174-193).  The test was negative for ischemia, and revealed no SVT with stress (R. at 174).  The physician who evaluated the results of the test noted Plaintiff had "good exercise tolerance."  Id.

---

[8] Supraventricular tachycardia is a rapid heartbeat originating in the atria, or upper chambers, of the heart.  See http://emedicinehealth.com/supraventricular_tachycardia/article_em.htm.

Plaintiff underwent radiofrequency ablation for tachycardia on April 17, 2002 (R. at 342-349)[9].  Treating cardiologist, Dr. Kwabena Boahene, opined Plaintiff had a good result from the procedure, as no further tachycardia was induced after the radiofrequency ablation was completed (R. at 345).

On June 5, 2002, Plaintiff followed up with treating cardiologist Dr. Joseph Battaglia (R. at 353).  Plaintiff reported that since the radiofrequency ablation was completed, she felt better and had no palpitations, lightheadedness, or dizziness.  Id.  Dr. Battaglia opined Plaintiff had an excellent result from the procedure, and "the overwhelming likelihood" was that Plaintiff would not have a recurrence of the condition.  Id.  The doctor advised Plaintiff to resume her normal activities.  Id.

Plaintiff underwent a scan and ultrasound of her thyroid gland on July 25, 2002 (R. at 460-461).  Consulting physician, Dr. Zella Small, observed Plaintiff had a normal-sized thyroid gland with a dominant left cystic nodule with the appearance of a multinodular goiter (R. at 461).  Using radioactive iodine, Dr. Small noted Plaintiff's two-hour uptake value was low-normal, but other values were within normal limits.  Id.

On November 8, 2002, Plaintiff was examined by consulting physician, Dr. Scott Edison, to rule in or out hemochromotosis (R. at 169-

---

[9] Radiofrequency ablation is a common nonsurgical procedure used to treat some types of rapid heart beating, including SVT.  Using fluoroscopy, a catheter with an electrode tip is guided into the area inside the heart where cells give off the electrical signals that stimulate the abnormal heart rhythm.  Mild and painless radiofrequency energy is transmitted to the area and destroys selected muscle heart cells.  The destruction of these cells prevents the area from conducting the extra impulses that caused the rapid heartbeats.  See http://www.americanheart.org/presenter.jhtml?=identifier=4682.

170).  Dr. Edison recommended Plaintiff undergo a liver and spleen scan, and a liver sonogram (R. at 170).

Plaintiff followed up with treating cardiologist, Dr. Battaglia, for a post-radiofrequency ablation examination on December 5, 2002 (R. at 352). Plaintiff reported feeling well, and denied chest pain, pressure, lightheadedness, dizziness, syncope, shortness of breath, or edema.  Id.  She reported occasional palpitations, and periods of exhaustion not associated with the palpitations or exertion.  Id.  Plaintiff's physical examination was unremarkable, but Dr. Battaglia recommended an EKG.  Id.  The EKG revealed normal sinus rhythm and no ischemic changes.  Id.

On January 16, 2003, Plaintiff was examined by Dr. Polkowski when she complained of elevated blood pressure, fatigue, and lower extremity swelling (R. at 210-211).  Plaintiff denied chest discomfort or pain, palpitations, shortness of breath, or syncope, and her physical examination was unremarkable (R. at 210).  Dr. Polkowski opined Plaintiff's blood pressure was insufficiently controlled, and her fatigue might be the result of thyroid dysfunction (R. at 211).  The doctor prescribed new blood pressure medication and a thyroid panel.  Id.

Plaintiff followed up with Dr. Polkowski on February 14, 2003, March 16, 2003, and March 26, 2003 (R. at 212-214).  At each visit, Plaintiff denied chest discomfort or tightness, chest pain, dizziness, palpitations, tachycardia, shortness of breath, or fatigue.  Id.  However, the doctor noted

Plaintiff's blood pressure continued to be insufficiently controlled and recommended another change in medication (R. at 214).

On May 4, 2003, Plaintiff was admitted to Community General Hospital complaining of chest pain radiating to her arm and neck (R. at 194-202, 206).  During this 24 hour hospitalization, physical examinations of Plaintiff were unremarkable (R. at 194).  Her EKG showed minor wave abnormalities, but was otherwise normal (R. at 195).  A stress test showed left ventricular fraction of 65 percent, with no evidence of ischemia, epicardial episode, or arrhythmias.  Id.  The consulting cardiologist opined Plaintiff had atypical chest pain that was likely caused by a spasm of unclear etiology.  Id.  Plaintiff was started on a nitroglycerin patch and instructed to follow up with her primary care physician, Dr. Polkowski.  Id.

After her hospitalization, Plaintiff followed up with Dr. Battaglia on May 6, 2003 (R. at 355).  She continued to complain of left chest pain radiating to the left shoulder and neck, increasing with exertion.  Id.  Plaintiff also reported shortness of breath and palpitations.  Id.  Plaintiff's physical examination and EKG were unremarkable, and the doctor noted her EKG showed similar tracings to one performed in December 2002.  Id.  The doctor recommended outpatient cardiac catheterization.  Id.

Plaintiff followed up with Dr. Battglia June 17, 2003, after undergoing cardiac catheterization (R. at 356).  The doctor noted Plaintiff's cardiac arteries were normal, but thought it possible she had either a cardiac or esophageal spasm.  Id.  The doctor elected to continue Plaintiff on "a little

bit of Nitroglycerin" since she reported it relieved her symptoms.  Id.  Plaintiff told Dr. Battaglia she could live without a definite diagnosis.  Id.

On October 14, 2003, Plaintiff was examined by Dr. Polkowski (R. at 279-280).  The doctor noted Plaintiff's blood pressure was under control (R. at 279).  Plaintiff reported chest pressure, but no pain, edema, or palpitations. Id.  Plaintiff's physical examination was unremarkable, although Dr. Polkowski noted Plaintiff's blood magnesium level was low and required supplementation (R. at 280).  The doctor opined the reason for Plaintiff's complaints of fatigue might be secondary to depression.  Id.

Plaintiff was examined by State agency examining physician, Dr. Kalyani Ganesh, on October 22, 2003 (R. at 228-232).  Dr. Kalyani observed Plaintiff was in no acute distress, and the physical examination was grossly unremarkable (R. at 230).  Her hearing was satisfactory for regular room conversation.  Id.  Plaintiff's gait and station were normal and she was able to dress and undress, and get on and off the examining table without assistance.  Id.  Examination of Plaintiff's heart revealed a regular rhythm with no audible murmur, gallop, or rub.  Id.  Musculoskeletal examination showed full flexion, extension, lateral flexion, and rotary movement of the cervical and lumbar spine.  Id.  Plaintiff exhibited full range of motion of shoulders, elbows, forearms, and wrists bilaterally, and full range of motion of the hips, knees, and ankles bilaterally.  Id.  Strength was 5/5 in the upper and lower extremities, and joints were non-tender and stable (R. at 230-231). Examination of the fine motor activity of Plaintiff's hands revealed her hand

and finger dexterity was intact, with grip strength of 5/5 bilaterally (R. at 231).

Neurologic examination showed physiologic and equal deep tendon reflexes

in Plaintiff's upper and lower extremities, with no motor or sensory deficit.  Id.

Dr. Kalyani opined Plaintiff had no gross limitation with regard to sitting,

standing, or the use of her upper extremities, but had a mild degree of

limitation with walking and climbing.  Id.

On October 28, 2003, Plaintiff reported to Dr. Battaglia that she had

a racing heartbeat and palpitations that awakened her at night (R. at 357).

Plaintiff claimed to have these symptoms at least nightly, and sometimes

several times a night.  Id.  The doctor prescribed the use a Holter monitor for

24 hours to track her symptoms.  Id.  The results of the Holter monitor record

failed to corroborate Plaintiff's claim of multiple instances of a racing

heartbeat and palpitations during the time she was attached to the monitor (R.

at 365).

Plaintiff was examined by treating urologist, Dr. Christopher

Pieczonka, on December 2, 2003, when she complained she had passed

kidney stones and had a history of kidney infections (R. at 386-387).  The

doctor suspected Plaintiff might have uric acid stones and recommended she

have a dynamic renal scan (R. at 387).  The renal scan showed no kidney

stones or renal obstruction (R. at 389).

On December 8, 2003, a non-examining State agency consultant

completed a Physical Residual Functional Capacity Assessment of Plaintiff,

using hospital and other medical records provided by her treating sources, as

well as the results of the consultative examination by Dr. Kalyani (R. at 233-237).  The consultant assessed Plaintiff as capable of performing most of the requirements of light work.  Id.

On December 17, 2003, Plaintiff was examined by consulting nephrologist, Dr. Adebowale Oguntola, to evaluate her hypertension, hypomagnesemia, and nephrolithiasis (R. at 299-302).  Plaintiff's physical examination was unremarkable (R. at 301).  The doctor recommended Plaintiff adopt a low protein and low sodium diet, and undergo an MRI of her renal arteries.  Id.  The MRI of Plaintiff's renal arteries and adrenal glands, and the MRA of her kidneys, revealed normal results (R. at 312-313).

Plaintiff followed up with her cardiologist, Dr. Battaglia, on December 23, 2003 (R. at 358).  She reported occasional chest discomfort if she did not use her nitroglycerin patch.  Id.  Dr. Battaglia opined "cardiacwise I think [Plaintiff] is doing okay."  Id.  The doctor noted he was still unsure if Plaintiff's complaints were the result of coronary spasm or esophageal spasm, and further opined "I do not think it is worthwhile to make a diagnosis at this time."  Id.  Dr. Battaglia recommended Plaintiff see him again in six months.  Id.

On January 6, 2004, Plaintiff's treating physician, Dr. Short, provided her with a letter stating Plaintiff was being treated by his office for upper extremity complaints and was unable to work (R. at 238).

Plaintiff was examined again by Dr. Oguntola on January 14, 2004 (R. at 307-308).  He reported that since Plaintiff's last visit in December 2003,

her serum magnesium, and the rest of her metabolic panel, was normal (R. at 307).  Plaintiff reported no complaints or symptoms of urinary problems.  Id.  The doctor recommended Plaintiff follow up with him in six months.  Id.

On January 21, 2004, Plaintiff was examined by treating physician, Dr. Polkowski (R. at 283-284).  While Plaintiff's physical examination was unremarkable, her blood pressure was high (R. at 283).  Dr. Polkowski prescribed a different blood pressure medication (R. at 284).

On January 22, 2004, Dr. Oguntola sent a letter to Dr. Polkowski advising her that Plaintiff's magnesium loss was extra-renal, and that a magnesium supplement would help Plaintiff control her magnesium level (R. at 309).

Plaintiff was examined again by consulting urologist, Dr. Pieczonka, on January 26, 2004 (R. at 379).  In a letter to Dr. Polkowski, Dr. Pieczonka opined that Plaintiff's complaint of right flank pain might not be genitourinary in origin, given that she had undergone multiple studies over the years with normal results, and no evidence of obstruction in her renal system.  Id.

On January 30, 2004, Dr. Polkowski prepared a Medical Source Statement of Ability To Do Work-Related Activities (Physical) (R. at 240-243).  Dr. Polkowski assessed Plaintiff as being unable to meet the demands of even a sedentary level of work.  Id.

Plaintiff was examined by Dr. Short on February 3, 2004, when she complained of pain, numbness, and tingling in her right arm and shoulder (R. at 327-329).  Upon examination, Dr. Short noted Tinel's test over the right

ulnar nerve was positive (R. at 328).  Plaintiff had decreased range of motion in the right elbow, but no evidence of instability of the joint.  Id.  The vascular supply to the elbow was normal.  Id.  Examination of Plaintiff's right wrist revealed normal range of motion, but decreased sensation in the ulnar distribution.  Id.  Tinel's test, Phalan's test, and Finklestein's test were negative.  Id.  Dr. Short recommended Plaintiff undergo a nerve conduction study (R. at 329).

On the day of Plaintiff's examination by Dr. Short, he prepared a Medical Source Statement of Ability To Do Work-Related Activities (Physical) (R. at 474-477).  Dr. Short assessed Plaintiff with numerous push/pull, postural, and manipulative limitations, and noted "This patient is disabled as of 8/99" (R. at 475-477).

Plaintiff was examined by Dr. Polkowski on February 27, 2004 (R. at 287-288).  Plaintiff reported Effexor was helping her depression and anxiety, and the doctor prescribed an increased dose (R. at 288).

On March 10, 2004, Dr. Polkowski prepared a letter for Plaintiff stating that because of Plaintiff's various medical problems, the doctor opined she would have a difficult time "holding gainful employment on a consistent basis" (R. at 376).

Plaintiff was examined by Dr. Polkowski on April 1, 2004, when she complained of fever and body aches (R. at 289-290).  Plaintiff's physical examination was unremarkable, and she denied chest pain, fatigue, palpitations, shortness of breath and syncope (R. at 289).  Plaintiff stated her

general health was good.  Id.  The doctor recommended Plaintiff drink lots of fluids, and prescribed an antibiotic (R. at 290).

Plaintiff followed up with Dr. Polkowski on April 9, 2004 (R. at 291-293).  Her fever and body aches had resolved, but she still had a cough (R. at 291).  Other than a cough, Plaintiff's physical examination was unremarkable (R. at 291-292).  She denied chest pain, edema, faintness, fatigue, palpitations, shortness of breath, and syncope (R. at 291).  Plaintiff reported her depression and anxiety had improved since her last visit with Dr. Polkowski.  Id.  The doctor recommended symptomatic treatment for Plaintiff's cough (R. at 293).

On May 13, 2004, Plaintiff underwent a nerve conduction study as requested by Dr. Short in February 2004 (R. at 330).  The results of the study were reviewed by consulting physician, Dr. Robert Weber.  Id.  Dr. Weber observed no evidence of nerve entrapment in the right carpal tunnel, and no evidence of radicular compromise.  Id.  Dr. Weber noted the conduction studies were quite good in both the median and ulnar nerves, and he could not identify a focal area of compromise.  Id.

Plaintiff was also examined by treating cardiologist, Dr. Battaglia, on May 13, 2004 (R. at 359).  She complained of a single episode of a "sensation that felt like an electrical shock along the left side of her chest."  Id.  Plaintiff had no recurrence of the event and denied chest tightness, lightheadedness, dizziness, palpitations, shortness of breath, or edema.  Id.  Plaintiff's physical examination and EKG revealed normal results.  Id.  Dr.

Battaglia noted he was "not sure what this electrical shock-like sensation was given that it has not recurred.  We will leave it at that."  Id.  The doctor made no changes to Plaintiff's treatment regimen.  Id

On May 28, 2004, Plaintiff complained to Dr. Short of pain in her right hand and wrist (R. at 331-333).  Upon examination, Dr. Short noted Plaintiff had decreased sensation in her fingertips, and had a positive Tinel's sign at her right wrist (R. at 332).  She had a negative Tinel's sign at her right elbow, but the doctor observed tenderness in the area where of the decompression of Plaintiff's right ulnar nerve.  Id.  Dr. Short observed Plaintiff's EMG results were normal in spite of Plaintiff's continued symptomatology (R. 333).  Plaintiff elected treatment by steroid injection into the right carpal tunnel.  Id.

Plaintiff followed up with Dr. Polkowski for her blood pressure medications on June 8, 2004 (R. at 294-295).  While Plaintiff complained of fatigue and palpitations, her physical examination was unremarkable (R. at 294).  The doctor noted Plaintiff's blood pressure control was improving (R. at 295).

On June 25, 2004, Plaintiff again complained to Dr. Short of pain in her right wrist and elbow (R. at 335-337).  Upon examination, the doctor noted Plaintiff had full range of motion in her wrist (R. at 336).  Sensory, motor, and vascular examinations were normal.  Id.  She had a range of motion between 20 degrees and 135 degrees in her right elbow with full pronation and supination.  Id.  Dr. Short noted some tenderness in the medial

epicondylar region.  Id.   Plaintiff reported good relief from the prior carpal tunnel injection, and requested a steroid injection in the area of the ulnar nerve decompression.  Id.

Plaintiff was examined by Dr. Battaglia on July 7, 2004, when she reported she had "been feeling OK" (R. at 360).  Plaintiff reported one episode of chest discomfort that went away in "about five minutes," and told the doctor "she is doing everything she likes."  Id.  She reported no palpitations, lightheadedness, or dizziness, although the doctor noted Plaintiff's blood pressure was "awfully high."  Id.  Dr. Battaglia recommended Plaintiff resume treatment with Norvasc to gain better control of her blood pressure.  Id.

Plaintiff followed up with Dr. Oguntola for treatment of her hypomagnesemia on July 20, 2004 (R. at 310-311).  The doctor noted her hypomagnesemia was well-controlled with her magnesium oxide supplement, but expressed concern that Plaintiff's blood pressure was still high (R. at 310). He recommended she resume taking Avapro with Norvasc, and stated he thought her sleep apnea might be worsening.  Id.

Plaintiff was examined by Dr. Battaglia on July 22, 2004 (R. at 361). He noted the combination of Norvasc and Avapro had lowered Plaintiff's blood pressure.  Id.  Dr. Battaglia recorded "I think that [Plaintiff] is doing well from a cardiovascular standpoint.  Her blood pressure has come under some good control."  Id.

On August 3, 2004, Plaintiff was examined by Dr. Polkowski (R. at 296-298). Plaintiff complained of palpitations and fatigue, but denied chest pain, faintness, and syncope (R. at 296). Her blood pressure was 110/60, and both physical and mental examinations were unremarkable (R. at 297). Dr. Polkowski recommended a sleep study for Plaintiff's sleep apnea and snoring (R. at 296).

Plaintiff was also examined by Dr. Short on August 3, 2004, when she reported continued pain and dysfunction in her right wrist and elbow (R. at 338-340). Upon physical examination, Plaintiff had full range of motion in her right elbow, tenderness at the medial epicondyle and mild tenderness at the ulnar nerve, with no varus or valgus instability (R. at 339). Her wrist examination revealed normal results. Id. Dr. Short recommended Plaintiff take Aleve, Vioxx, or Celebrex, and use a wrist immobilizer. Id.

On September 10, 2004, Plaintiff underwent a polysomnogram evaluation to study her sleep patterns (R. at 481-482). Consulting physician, Dr. Antonio Culebras, noted Plaintiff suffered from sleep apnea (R. at 482). Plaintiff was fitted with a Profile Lite nasal mask with a heated inline humidifier that eliminated her sleep apnea (R. at 484).

Dr. Battaglia provided Plaintiff with a letter dated September 23, 2004, in which he stated Plaintiff underwent radiofrequency ablation for tachycardia (R. at 473). Dr. Battaglia noted Plaintiff's stress tests had been negative, and cardiac catheterization showed no evidence of ischemic disease. Id. He stated Plaintiff's chest discomfort responded to

28

nitroglycerine, and he thought Plaintiff "might have coronary artery spasm." Id.  He also stated Plaintiff took Imdur and Norvasc.  Id.  Dr. Battaglia noted "I think this recurrent chest discomfort would make it difficult for you to be employable."  Id.  This is the final medical entry for medical evidence in Plaintiff's record.

　　　　The ALJ assessed Plaintiff capable of a full range of sedentary work based on the totality of evidence presented by her treating physicians, consulting physicians, test results, and the opinion of a State agency examining physician and a State agency disability analyst.  Plaintiff's physical examinations, including cardiac tests, neurological tests, blood tests, electrocardiograms, CT scans, MRIs, and motor, sensory, and strength examinations were consistently normal, or showed modest findings corrected by medication (R. at 96-482).  As an example, Plaintiff underwent carpal tunnel release on her left and right wrists in late 1993 (R. at 248-253).  She claimed to be pain free by late November 1993, and was released by Dr. Short to perform her regular duties as a medical records clerk (R. at 253).  While Dr. Short opined Plaintiff would have some permanent partial disability in both hands, in May 1997 he rated her level of disability in her right hand and wrist at only a ten percent scheduled loss of use of her right wrist (R. at 255, 263).  In June 1995, Plaintiff complained to Dr. Short of pain in her right elbow (R. at 268).  Nerve conduction studies were normal for both Plaintiff's right and left elbows, with only slightly decreased sensory action potential amplitude for the right ulnar nerve (R. at 268-269).   Plaintiff continued to

complain of pain and paresthesias in her elbow and Dr. Short opined she had right ulnar nerve entrapment (R. at 256).  In March 1996, Dr. Short performed surgery to decompress Plaintiff's right ulnar nerve, and in May 1997, he estimated Plaintiff's scheduled loss of use of her right elbow at 20 percent (R. at 258-259, 263).  Plaintiff continued to complain periodically to Dr. Short of pain and numbness in her right hand and elbow, but physical examination and tests revealed minimal findings.  Plaintiff was examined by State agency physician, Dr. Kalyani Ganesh, in October 2003, and Dr. Ganesh found no evidence of limitation in Plaintiff's upper extremities, wrists, or hands (R. at 230-231).  When Plaintiff was examined by Dr. Short on February 4, 2004, her right hand and wrist had normal range of motion (R. at 327-329).  While the doctor noted decreased sensation in the ulnar distribution, nerve tests were negative.  Id.  He observed Plaintiff's elbow had decreased flexion, and a positive Tinel's test over the ulnar nerve.  Id.  Dr. Short recommended a nerve conduction study, and when this study was completed in May 2004, the consulting physician, Dr. Weber, opined Plaintiff's nerve conduction in her right hand, wrist, and elbow was "quite good" (R. at 330).  From the medical evidence in Plaintiff's record, it is unclear to the Court what medical findings were used by Dr. Short to base his restrictive estimate of Plaintiff's ability to perform work-related activities, and his statement that "[Plaintiff] is disabled as of 8/99" (R. at 474-477).

As a second example, Plaintiff was diagnosed with supraventricular tachycardia in early April 2002 (R. at 172-173, 434).  She underwent

radiofrequency ablation to correct a rapid heartbeat on April 17, 2002, with good results (R. at 342-349, 353).  Although Plaintiff periodically complained of chest pain, pressure, and palpitations, physical examinations and tests revealed normal results.  When Plaintiff complained of chest pain and was admitted to Community General Hospital in May 2003, her physical examination, EKG, stress test, and metabolic panel were normal (R. at 194-202, 206, 207-209).  As a follow-up to Plaintiff's hospitalization, treating cardiologist, Dr. Battaglia, recommended cardiac catheterization (355).  The result of this procedure showed Plaintiff had normal coronary arteries and normal left ventricular function (R. at 221-222).  Plaintiff continued to complain of chest pain, palpitations, and other symptomatology during late 2003 through late 2004, but physical examinations, EKGs, Holter monitor evaluation, and blood panels revealed either normal results, or minor anomalies only (R. at 356, 357, 358, 359, 360, 365).  On July 7, 2004, Plaintiff reported to Dr. Battaglia that she had been "feeling OK," and "she is doing everything that she likes" (R. at 360).  After a visit with Plaintiff on July 22, 2004, Dr. Battaglia noted Plaintiff was "doing well from a cardiovascular standpoint" (R. at 361).  The doctor still had not provided a differential diagnosis for Plaintiff's complaints of chest discomfort with respect to whether her symptomatology was caused by coronary artery spasm or esophageal spasm.  Thus, it is as puzzling to the Court as it must have been to the ALJ, when absent any other medical evidence, Dr. Battaglia issued to Plaintiff his letter of September 23, 2004, stating Plaintiff's recurrent chest discomfort

"might [be caused] by coronary artery spasm", and that her "chest discomfort would make it difficult for [her] to be employable" (R. at 473).

As a third example, Plaintiff was treated for routine medical care, hypomagnesemia, and high blood pressure on a regular basis by Dr. Polkowski.  Dr. Polkowski tracked Plaintiff's blood pressure readings, and in consultation with Dr. Battaglia, adjusted her medications as needed (R. at 294-295, 296-298).  Dr. Polkowski also consulted with Dr. Oguntola, and followed Plaintiff's blood magnesium levels (R. at 279-280, 296-298, 299-302, 307-308, 310-311)  Dr. Polkowski physically examined Plaintiff frequently, and recorded Plaintiff's self-reported symptoms of chest pressure and fatigue; however, except for high blood pressures readings, occasional low blood magnesium levels, and one or two instances of lower extremity edema, examinations of Plaintiff revealed unremarkable results (R. at 210-211, 212, 213, 214, 215-216, 217-218, 277-278, 279-280, 285-286, 294-295, 296-298).  On January 30, 2004, Dr. Polkowsi began treating Plaintiff with Effexor for reported symptoms of anxiety and depression, but did not recommend that Plaintiff seek treatment from a mental health professional (R. at 285-286, 291-293, 294-295, 296-298).  It appears to the Court that Dr. Polkowski's Medical Source Statement of Ability To Do Work-Related Activities (Physical), in which she assessed Plaintiff as unable to meet the requirements of even sedentary work, and her letter to Plaintiff suggesting Plaintiff would have trouble working on a consistent basis, are assessments based primarily on Plaintiff's self-reported symptoms, and on minor medical impairments

32

corrected with medications.  Thus, it was not improper for the ALJ to disregard Dr. Polkowski's opinion when making his determination that Plaintiff retained the residual functional capacity to perform sedentary work (R. at 15-19).

The ALJ did not base his assessment of Plaintiff's residual functional capacity on his lay opinion only, while ignoring overwhelming evidence that Plaintiff is under a disability, as Plaintiff claims.  See Plaintiff's Brief, p. 8.  The ALJ's assessment was supported by the detailed report of Plaintiff's physical examination from State agency examining physician, Dr. Ganesh, and by the review of Plaintiff's medical records by a non-examining State agency consultant, A. Del Nero (R. at 228-232, 233-237).  It is well settled that an ALJ is entitled to rely upon the opinions of a State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability.  See 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(f)(2), 416.912(b)(6), 416.913(c), and 416.927(f)(2); see also Leach ex. Rel. Murray v. Barnhart, No. 02 Civ. 3561, 2004 WL 99935, at 9 (S.D.N.Y. Jan. 22, 2004) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims.  As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.")  Such reliance is particularly appropriate where, as here, the opinions of the State agency physician and non-examining State agency consultant are supported by the weight of the record evidence, including the medical findings of Plaintiff's examining and treating physicians.

Based on the foregoing, the Court finds the ALJ did not ignore the medical findings and opinions of Plaintiff treating physicians, Doctors Polkowski, Short, and Battaglia, but did properly reject their conclusory statements, such as "Plaintiff is unable to work at this time," "holding gainful on a consistent basis [would be] very difficult for [Plaintiff]," and "I think this recurrent chest discomfort would make it difficult for [Plaintiff] to be employed" (R. at 238, 376, 473).  The ALJ also properly rejected the restrictive assessments of Plaintiff's residual functional capacity completed by Doctors Polkowski and Short, as these assessments were not supported the physicians' own records (R. at 240-243, 244-247, 474-477).  It is the sole responsibility of the ALJ to weigh all medical evidence and resolve any material conflicts in the record.   See Richardson v. Perales, 402 U.S. 389, 399, 91 S. Ct. 1420, 1426, 28 L. Ed. 2d 842 (1971).  Under the circumstances presented in this case, it cannot be said that the ALJ disregarded the medical evidence from Plaintiff's treating physicians and instead substituted his lay opinion for competent medical evidence.  Rather, the Court finds that the ALJ carefully reviewed and acknowledged the medical evidence and opinions of Doctors Polkowski, Short, and Battaglia, and rejected those opinions deemed to be conclusory or inconsistent with the medical evidence these doctors provided in Plaintiff's record.

**The ALJ Failed to Consider Plaintiff's Pain and Subjective Symptom Testimony:**

11.    Plaintiff's second allegation is that the ALJ failed to consider Plaintiff's pain and subjective symptom testimony in determining Plaintiff was

34

not disabled under the Act.  As an example, Plaintiff claimed that because of

fatigue, she had to nap in the morning, rest for two hours each afternoon, and

because of her heart problems, she was unable to sleep at night (R. at 495,

500).  She claimed great anxiety, pain in both hands, and pain in her right

elbow and shoulder (R. at 498-501).  She claimed that because of her

electrolyte imbalance, she was tired and weak and had erratic heartbeats and

coronary artery spasms (R. at 503). The ALJ considered Plaintiff's testimony

regarding her pain and symptoms, weighed the testimony against the

objective medical evidence, and found Plaintiff's complaints of uncontrollable

and disabling pain, fatigue, anxiety, and heart problems to be not entirely

credible (R. at 18).

Courts in the Second Circuit have determined pain is an important

element in DIB and SSI claims, and pain evidence must be thoroughly

considered.  See Ber v. Celebrezze, 333 F.2d 923 (2d Cir. 1994).  Further, if

an ALJ rejects a claimant's testimony of pain and limitations, he or she must

be explicit in the reasons for rejecting the testimony.  See Brandon v. Bowen,

666 F. Supp. 604, 609 (S.D.N.Y. 1997).

However, subjective symptomatology by itself cannot be the basis

for a finding of disability.  A claimant must present medical evidence or

findings that the existence of an underlying condition could reasonably be

expected to produce the symptomatology alleged.  See 42 U.S.C. §§

423(d)(5)(A), 1382c (a)(3)(A); 20 C.F.R. §§ 404.1529 (b), 416.929; SSR 96-

7p; Gernavage v. Shalala, 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995).  In this

case, there is no question that Plaintiff's history of tachycardia, left ankle ligament repair, and bilateral carpal tunnel release are severe impairments, but her reported subjective symptoms, especially those symptoms pertaining to the tachycardia and bilateral carpal tunnel release, suggest a greater restriction of function than would be indicated by the medical evidence in the record.  Thus, the ALJ considered Plaintiff's daily activities, the type and nature of the symptoms reported, the medication and other treatment Plaintiff used to alleviate her symptoms, and any other measures she used to relieve pain (R. at 17-19).  See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 96-7p.  The ALJ's decision shows he reviewed Plaintiff's complaints of pain and other symptoms, but found the medical and other evidence did not corroborate Plaintiff's claim of disabling pain (R. at 18).

As an example, the ALJ assessed Plaintiff had some limitations because of her tachycardia, but noted her clinical testing was "essentially normal," and that her cardiologist had "established no cause" (e.g. esophageal spasm or cardiac artery spasm) for Plaintiff's subjective symptomatology (R. at 17).  Plaintiff took a small dose of nitroglycerin to relieve her discomfort (R. at 356, 358).  In fact, when Plaintiff's cardiologist considered more advanced testing to determine if she had coronary artery spasms, he asked her that if the symptoms are relieved with a "little bit of nitroglycerine,"  could she could "live without a definite diagnosis," and she said that she could (R. at 18, 356).  While Plaintiff's intermittent high blood pressure was of concern to her cardiologist and other treating physicians, the

ALJ observed that Plaintiff's blood pressure was controlled with medications, and the medical record did not reveal "end organ damage due to this symptom" (R. at 18).

The ALJ also reviewed Plaintiff's claims of pain and limitations from orthopedic pain (R. at 16). He pointed out that Plaintiff claimed disabling pain associated with bilateral carpal tunnel release and right ulnar nerve decompression. Id. However, he noted Plaintiff's claims are contrary to the evidence of record, and are not supported by the results of her consultative physical examination in October 2003. Further, while Plaintiff was treated with steroid injections into her bilateral carpal tunnels, and into her right medial epicondyle region in May and June 2004, in August 2004 Dr. Short simply recommended she use a wrist immobilizer and taken Aleve, Celebrex, or Vioxx to relieve her discomfort (R. at 331-333, 335-337, 338-340).

The ALJ observed in his examination of Plaintiff's record that other then her severe impairments of tachycardia, left ankle ligament repair, and bilateral carpal tunnel release, most of Plaintiff's ailments have been acute and short-lived, such as renal colic, or ailments of the nuisance variety, such as hypomagnesemia that is controlled with magnesium supplements, and left ankle swelling associated with an earlier sprain (R. at 17). Plaintiff's reported mental symptoms of anxiety and depression were treated by her general practitioner, and from the record, it appears these symptoms were not so severe as to warrant referral to a mental health professional. Id. The ALJ appropriately assessed that these ailments, either taken alone or combined

with Plaintiff's severe impairments, caused no more than minimal limitations on Plaintiff's ability to perform work-related activity.

In assessing her credibility, the ALJ also looked at Plaintiff's activities of daily living (R. at 18).  Plaintiff is independent in her basic activities of daily living, including bathing, dressing and hair care (R. at 57-58).  She reported that she rose daily at 5:30 A.M. to have coffee with her adult son, did laundry and other housework, ran errands, napped, fixed lunch, rested, fixed dinner, and chatted on the telephone in the evening (R. at 18, 57).  She did light yard work (R. at 59). Plaintiff reported she shopped with her husband, and enjoyed trips to Pennsylvania and Florida to visit relatives (R. at 18, 497).  Plaintiff belongs to a church, and is an auxiliary member of her local fire department where she helps with community projects (R. at 18, 497). She reported enjoying a variety of hobbies such as scrapbooking, playing bingo, reading, doing seasonal crafts, and bird watching (R. at 18, 497). Plaintiff told the ALJ she has "a lot of friends" (R. at 497).  Such wide and varied activities and interests do not corroborate Plaintiff's claim of totally disabling pain and other limitations.

In sum, the Court finds the ALJ properly considered Plaintiff's pain and symptomatology, along with the medical and other evidence in the record, and the totality of evidence does not substantiate Plaintiff's claim that her pain and other symptoms were disabling.  Accordingly, the ALJ exercised his discretion to evaluate the credibility of Plaintiff's testimony, presented an explicit summary of his evaluation, and rendered an independent judgment

regarding the extent of Plaintiff's subjective complaints based on the objective medical and other evidence (R. at 25).  See e.g. Mimms v. Sec'y of Health and Human Servs., 750 F.2d 180, 196 (2d Cir. 1984).

## Conclusion

12.     After carefully examining the administrative record, the Court finds substantial evidence supports the ALJ's decision in this case, including the objective medical evidence and supported medical opinions.  It is clear to the Court that the ALJ thoroughly examined the record, afforded appropriate weight to all the medical evidence, including Plaintiff's treating physicians, consultative examiner, and State agency medical consultant, and afforded Plaintiff's subjective claims of pain an appropriate weight when rendering his decision that Plaintiff is not disabled.  The Court finds no reversible error, and further finding that substantial evidence supports the ALJ's decision, the Court will grant Defendant's Motion for Judgment on the Pleadings and deny Plaintiff's motion seeking the same.


IT IS HEREBY ORDERED, that Defendant's Motion for Judgment on the Pleadings is GRANTED.


FURTHER, that Plaintiff's Motion for Judgment on the Pleadings is denied.

FURTHER, that the Clerk of the Court is directed to take the necessary steps to close this case.


SO ORDERED.


Dated:  July 3, 2008
        Syracuse, New York

Victor E. Bianchini
United States Magistrate Judge